IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| RITA WELLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 3:06-CV-806 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social | ) | |
| Security[1], | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court for review of the Commissioner of Social Security's decision denying disability insurance benefits to Plaintiff, Rita Wells.  For the reasons set forth below, the Commissioner's final decision denying social security benefits is **AFFIRMED** pursuant to 42 U.S.C. section 405(g).  Accordingly, the Clerk is **ORDERED** to close this case.

BACKGROUND

In August 2003, Plaintiff, Rita Wells ("Wells"), filed an

_____

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Michael J. Astrue, in his official capacity only, is substituted as the Defendant in this action.

application for Social Security disability and disability insurance benefits with the United States Social Security Administration. (Tr. 59-63). Wells allegedly became disabled on March 20, 2003. (Tr. 60). Wells reported that she suffered from lumbar disc syndrome, which resulted in leg and back pain and restricted her ability to lift, push, pull, stand and bend. (Tr. 66-67).

Wells' claim was originally denied on December 11, 2003. (Tr. 38-42). Wells filed a Request for Reconsideration, which was denied on March 14, 2004. (Tr. 34-36). Wells then requested a hearing before an administrative law judge. (Tr. 33). On September 29, 2005, Administrative Law Judge Yvonne K. Stam ("ALJ") held an evidentiary hearing regarding Wells' alleged disability. (Tr. 274-296). The ALJ issued her decision on July 31, 2006, finding that Wells was not entitled to disability benefits. (Tr. 13-19). Wells then filed a request for review with the Appeals Council of the Social Security Administration. (Tr. 8-9). The Appeals Council denied Wells request for review. (Tr. 4-6). Accordingly, the ALJ's decision became the Commissioner's final decision. See 20 C.F.R. § 422.210(a)(2005). Plaintiff has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. section 405(g).

DISCUSSION

Facts

    Personal and work history

Wells was born on March 3, 1959. (Tr. 60, 63). She was 46 years old at the time of the administrative hearing and 47 years of age on the date that the ALJ issued her decision. (Tr. 60, 63). Wells is a high school graduate. (Tr. 71). She worked at Ford Meter Box as a production and factory worker from 1988 through March 19, 2003. (Tr. 67). At Ford Meter Box, she would frequently lift 50 pounds or more and the heaviest weight she lifted was 100 pounds. (Tr. 68). Wells claims that she became unable to work on March 20, 2003, due to her back condition.

    Medical evidence presented at administrative hearing

In May 2002, Wells visited her family physician, Dr. Stephen Fassino, complaining of pain in the right S1 area of her back with radiating pain. (Tr. 152). Dr. Fassino assessed her with acute sciatica and referred her to get x-rays and an MRI. (Tr. 151, 152). The x-rays revealed a normal study of the lumbar spine. (Tr. 165). The MRI showed degenerative disc disease L4-5 and L5-S1 with very small central disc protrusions at both levels, which did not result in significant encroachment on the thecal sac. (Tr. 164). There was no evidence of central spinal stenosis or disc herniation elsewhere. (Tr. 164).

-3-

On May 22, 2002, Wells underwent multiple region trigger point injections with Dr. Joe Glazier for her low back myofascial pain syndrome and lumbar radiculopathy. (Tr. 124). The following weeks, Dr. Glazier performed three lumbar epidural blocks on Wells. (Tr. 112-118). After these procedures, Dr. Glazier found that Wells' neck and upper back discomfort improved dramatically, but still retained minimal lower back radicular discomfort. (Tr. 112). Dr. Glazier planned to have Wells continue on her medication and complete a physical therapy regimen. (Tr. 112).

Wells continued seeing Dr. Fassino for back pain through March 21, 2003. (Tr. 143-152). On March 21, Dr. Fassino referred Wells "to neurosurgery within the next week, Dr. Kachmann as patient has requested his service be contacted." (Tr. 143). On March 24, 2003, Wells saw Dr. Kachmann, who recommended a surgical fusion of the L4-5 and L5-S1 areas. (Tr. 228). On April 22, 2003, Dr. Kachmann performed the L4-S1 laminectomy and facetectomy. (Tr. 224-227).

On November 15, 2003, Dr. Mandaret performed a consultive examination of Wells. (Tr. 129-130). Upon examination, Dr. Mandaret found Wells straight-leg raise was negative bilaterally, motor strength was normal in all muscle groups, sensory exam was symmetric and normal, deep tendon reflexes were symmetric and normal, hand grip was normal and symmetric, fine finger movements were normal, and there was no evidence of fasciculations, atrophy,

-4-

or rigidity. (Tr. 130). Dr. Mandaret also stated that Wells' gait and station were antalgic, she was unable to do heel and toe walk, she was not able to squat, and she was not able to bend because of back pain. (Tr. 129-130).

Wells visited Dr. Kachmann for a follow-up on November 17, 2003. (Tr. 219). While Wells complained of some low back aching pain and stiffness. Upon review of the x-ray films, Dr. Kachmann found her fusions looked "great," but did note some straightening compared to normal cervical lordosis. (Tr. 219). Dr. Kachmann referred Wells to Dr. David Lutz, a physiatrist, for a formal back rehabilitation program. (Tr. 219). Aside from that referral, Dr. Kachmann found Wells to be healed and he released her to normal activities as tolerated. (Tr. 219).

On December 4, 2003, Dr. Lopez, a state agency physician, reviewed the evidence in Wells' file and performed a residual functionality assessment of her. (Tr. 169-176). Dr. Lopez found that Wells had an antalgic gait and station stable. (Tr. 170). Dr. Lopez noted that Wells had difficulty getting on and off of the exam table. (Tr. 170). She was unable to heel/toe walk, squat or bend secondary to pain. (Tr. 170). There was tenderness present around the incisional scar in her lumbar spine. (Tr. 170). There were spasms present in the paraspinal muscles. (Tr. 170). Wells' lumbar range of motion was not checked secondary to pain. (Tr. 170). The range of motion of all other joints was within normal

limits.  (Tr. 170).  Her muscle/grip strength were fine and within normal limits as well.  (Tr. 170).  Straight leg raise was negative bilaterally.  (Tr. 170).  The pathology report revealed lumbar degenerative disc disease with central tears and protrusions at L5-S1.  (Tr. 170).  X-rays revealed a fusion at L4-S1 and normal alignment of the spine.  (Tr. 170).  As a result of these findings, Dr. Lopez concluded that Wells could: (1) lift and/or carry 20 pounds occasionally; (2) lift and/or carry 10 pounds frequently; (3) stand and/or walk (with normal breaks) for a total of about 6 hours in an 8 hour workday; (4) sit for a total of about 6 hours in an 8 hour workday; and (5) push and/or pull an unlimited amount, other than as shown for lift and/or carry.  (Tr. 170).  Dr. Cocoran, also a state physician, reviewed the record evidence and affirmed Dr. Lopez's assessment.  (Tr. 176).

On December 9, 2003, Wells met with Dr. Lutz.  After reviewing Wells' personal and medical history along with performing an in-office examination, Dr. Lutz was under the impression that Wells suffered from chronic low back pain with mechanical lumbosacral dysfunction.  (Tr. 215).  Dr. Lutz believed Wells would benefit from conservative treatment measures and prescribed a spine rehabilitation program.  (Tr. 215).

Wells returned to Dr. Lutz on January 30, 2004.  (Tr. 205-207).  Dr. Lutz reviewed physical therapy notes that reflected Plaintiff's slow but gradual improvement until seven days previous,

when she used her home treadmill which caused her pain.  (Tr. 207).
Dr. Lutz noted that while Wells reported pain in her right lower
extremity, there were no radicular pains as they had resolved.
(Tr. 207).  Dr. Lutz prescribed Vicodin and told Wells to continue
physical therapy and perform it gradually to her tolerance.  (Tr.
207-208).

Wells again visited Dr. Lutz on February 12, 2004, reporting
low back pain and right lower extremity pain.  (Tr. 202-203).  Dr.
Lutz recommended a series of lumbar epidural steroid injections.
(Tr. 203).  Dr. Lutz noted that Wells was not presently ready to
return back to work, but was hopeful that she would be cleared to
return back to work with restrictions in the near future.  (Tr.
203).

In March 2004, Wells returned to Dr. Lutz after undergoing her
first epidural steroid injection.  (Tr. 199).  Wells reported that
overall her back was slightly better following the epidural
injection, but that she continued to have right lower extremity
pain.  (Tr. 199).  Dr. Lutz scheduled a second epidural steroid
injection, prescribed pain medication, and told Wells to continue
her home exercises.  (Tr. 200).  On March 30, 2004, Wells reported
doing better after the second epidural steroid injection, and a
follow up visit was scheduled for April 6, 2005.  (Tr. 196).

In February 2005, Wells underwent a functional capacity
evaluation performed by Network Medical Review Company.  (Tr. 248-

257).   A report was prepared by Melissa D. Coates, a physical therapy assistant, and L. Smith, a physical therapist.   (Tr. Tr. 248-257).   That report was reviewed by Cyndi Scott, an occupational therapist.   After a two-day evaluation, all three of these individuals came to the conclusion that Wells cannot work.   (Tr. 257).   While they reported that Wells demonstrated overreacting behaviors during the testing, and engaged in self-limiting behavior, they still determined that the functional capacity examination was valid with fair and consistent effort.   (Tr. 255-256).

Administrative hearing testimony

Wells, her husband Charles, her daughter April, and Joseph Thompson, a vocational expert, testified during the administrative hearing.   (Tr. 274-296).

 Wells testified that she can't do anything for long before pain starts in her back and leg.   (Tr. 278).   When the pain starts, Wells either lies on the couch or sits on a recliner with a heating pad to relieve the pain.   (Tr. 278).   Wells has a prescription for Vicodin, which helps curb the pain, but does not cure it.   (Tr. 278).   In a typical day, Wells would get up around 8 a.m., get a cup of coffee, and lay on the couch with her legs propped up for approximately an hour.   (Tr. 279).   Then she may get up and spread the covers over her bed.   (Tr. 279).   She may also accompany her

husband at times to various places, such as the bank. (Tr. 279).

The ALJ asked Wells how long she could sit in an upright chair. (Tr. 280). Wells responded approximately 30 to 45 minutes. (Tr. 280). Upon further questioning from Wells' counsel, though, Wells changed her answer. She stated that when she responded that she can sit for 30-45 minutes, she meant in a recliner with her feet up. (Tr. 282). The ALJ asked Wells how long she could stand in one place and do a chore without moving around. (Tr. 280). Wells answered about 10 to 20 minutes. (Tr. 280). The ALJ then asked Wells how long she could walk, to which Wells answered between 10 to 20 minutes. (Tr. 280). Upon further questioning from Wells' counsel, Wells altered her answer by stating that she cannot walk 10 to 20 minutes at one time without sitting down intermittently. (Tr. 282-283). Also, the ALJ asked Wells how much she could lift, to which Wells answered about 10 pounds. (Tr. 280). Upon further questioning from Wells' counsel, though, Wells stated that she cannot lift 10 pounds very often and lifting 10 pounds hurts her back. (Tr. 283). Wells testified that since her surgery, her husband does the grocery shopping and that she and her daughter, April, do the laundry. (Tr. 281). Wells does cook for the family at times. (Tr. 281). Wells stated that her condition at the hearing was essentially unchanged from March 2003. (Tr. 280). Wells stated that before she was hurt, she was active; she bowled, walked for miles a day, cleaned her house and anything else she

-9-

wanted to do.  (Tr. 281, 286).

Wells' husband, Charles, testified that they had been married for over 29 years.  (Tr. 287).  Charles stated that before her injury, Wells was very active.  Charles stated that he and his wife used to take daily mile-long walks.  (Tr. 287).  In addition, his wife used to thoroughly clean the house and work at Ford Motor Box approximately 40-45 hours a week.  (Tr. 287).  They also used to take yearly vacations.  (Tr. 287).  After the injury, his wife is not able to do much of anything around the house and cannot sit long enough to go on vacation.  (Tr. 287).  If Wells tries to do something around the house, she usually ends up laying on the couch, taking Vicodin to relieve the pain.  (Tr. 288).

Wells' 23 year-old daughter, April, is a home-based case manager at Ford County Counseling Center, and testified at the hearing.  (Tr. 289).  April testified that her mom could do pretty much anything before she got injured; she worked, cleaned, bowled, cooked and shopped.  (Tr. 289-290).  Now, Wells can hardly do anything.  (Tr. 290).  She cooks only small meals; she can't bend down or reach up for things; she can't drive very long; and can only shop for 20 minutes without being in pain.  (Tr. 290).

Joseph Thompson, a vocational expert, testified at the hearing.  (Tr. 291).  Mr. Thompson agreed that his testimony would be consistent with the DOT, the SCO, and supporting publications, and if not so consistent, Mr. Thompson would advise the ALJ of any

-10-

inconsistency.  (Tr. 291).  Before the hearing, Mr. Thompson prepared a past relevant work summary for Wells, wherein he provided a DOT code and classified the physical demand of Wells' past relevant work as light, and light as performed.  (Tr. 106). This was admitted as Exhibit 11-E at the hearing.  During his testimony, Mr. Thompson reviewed Exhibit 2-E, which is the description of Wells' past work as she performed it.  (Tr. 292-293).  Based on that review, Mr. Thompson amended Exhibit 11-E, to reflect a new DOT code and changed the physical demand of the past relevant work as medium, heavy as performed.  (Tr. 293).  Wells' counsel agreed that Mr. Thompson's amendment was correct.  (Tr. 293).

The ALJ then posed a hypothetical to Mr. Thompson.  The ALJ asked if an individual could occasionally lift 20 pounds, frequently lift 10 pounds, stand and walk for about 6 hours, sit about six hours, only occasionally climb, balance, stoop, kneel, crouch or crawl, could that individual perform Wells' past work. (Tr. 293).  Mr. Thompson answered in the negative.  (Tr. 293). However, Mr. Thompson pointed out that there are approximately 2500 other assembly positions, light and unskilled, that such an individual could perform.  (Tr. 294).  In addition, there are approximately 1,000 packager positions and 4,000 cashier positions that such an individual could perform.  (Tr. 294).

Upon questioning, Mr. Thompson testified that if an individual

-11-

would require, in addition to the limitations in the first hypothetical, the opportunity to sit and stand at will, the assembly positions would be reduced to 700, the packager positions would be reduced to 500, and the cashier positions would be reduced to 1,500. (Tr. 294).

Mr. Thompson further testified that if the individual had the same limitations as in the second hypothetical, but lifting was limited to a maximum of ten pounds, that individual could not perform the packager, assembly or cashier positions. (Tr. 294). However, that individual would be considered to work sedentary unskilled positions, which include bench worker, approximately 100 positions, coder of brake linings, approximately 100 positions, and surveillance monitor, approximately 300 positions. (Tr. 294).

Wells' attorney then attempted to pose a hypothetical question that provided for less than full time work. (Tr. 295). The ALJ did not permit Mr. Thompson to answer the question, based on the fact that SSR 96-8p specifically provides that except in the case where history of part-time work applies, only full time work is considered. (Tr. 295-296). Therefore, the ALJ ruled, a hypothetical for less than full time work is not appropriate. (Tr. 296).


Evidence Submitted to the Appeals Council

Wells submitted additional materials to the Appeals Council

-12-

that were not submitted to the ALJ at or before the administrative hearing. Specifically, Wells submitted medical records covering the periods of January 25, 2005, to December 29, 2005 from Dr. Lutz. (Tr. 3). On January 25, 2005, Wells visited Dr. Lutz for a follow up. (Tr. 270-273). Wells continued to report chronic low back pain. (Tr. 270). Dr. Lutz reported that Wells has showed for five of the twelve scheduled physical therapy sessions. (Tr. 270). Wells indicated that her current pain level was 3-4/10. (Tr. 270). Dr. Lutz recommended that Wells continue taking Neurontin and Vicodin and prescribed Wells further physical therapy sessions. (Tr. 272). Wells presented before Dr. Lutz again on March 29, 2005. (Tr. 267). Dr. Lutz recommended a referral to pain management. (Tr. 268). Wells next appointment with Dr. Lutz was on July 19, 2005. (Tr. 264). Wells visited Dr. Lutz next on November 15, 2005. (Tr. 261). Finally, Wells visited Dr. Lutz on December 29, 2005. (Tr. 258).


DISCUSSION

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .." *Id.* Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a decision."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In determining whether substantial evidence exists, the Court shall examine the record in its entirety, but shall not substitute its own opinion for the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  With that in mind, however, this Court reviews the ALJ's findings of law de novo and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings.  *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for disability benefits under the Social Security Act, the claimant must establish that he is disabled.  To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 4169(i)(1).  To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

Step 1:   Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to Step 2.

Step 2:   Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months?  If not, the claim is disallowed; if yes, the inquiry proceeds to Step 3.

Step 3:   Does the claimant have an impairment or combination of

-14-

impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404, Subpt. P, App. 1? If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to Step 4.

Step 4:   Is the claimant able to perform his past relevant work experience? If yes, the claim is denied; if no, the inquiry proceeds to Step 5 where the burden of proof shifts to the Commissioner.

Step 5:   Is the claimant able to perform any other work within his residual functional capacity in the national economy: If yes, the claim is denied; if no, the claimant is disabled.

20 C.F.R. § 404.1520(a)(4)(i)-(iv); see also *Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

In this case the ALJ found that Wells did not work after her alleged onset date, but was paid disability benefits by her former employer, satisfying Step 1. (Tr. 14). The ALJ went on to find that Wells had a combination of severe impairments - obesity and post-fusion back pain - that satisfied Step 2. (Tr. 14). However, the ALJ did not find that those impairments met or equaled any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 14). Thus, Wells was not able to claim disability under Step 3. (Tr. 14). The ALJ then found that Wells retained the residual functional capacity for light work that did not require more than occasional postural changes. With this residual functional capacity, the ALJ determined that Wells could not perform her past relevant work at Step 4. (Tr. 19). However, the ALJ concluded that Wells could perform a full range of light work within her

-15-

residual functional capacity that exists in the national economy. (Tr. 18-19). Therefore, the ALJ decided that Wells was not disabled under Step 5. Wells takes issue with this conclusion on a number of fronts.

Essentially, Wells complains that the ALJ's finding with regard to her residual functional capacity was not supported by substantial evidence. Wells claims that the ALJ erroneously determined that Wells' and her family's testimony was not consistent with the medical evidence and, thus, incredible. Wells also complains that the ALJ erred in not giving any credit to the February 2005 Functional Capacity Evaluation. Finally, Wells takes issue with the ALJ wondering about the absence of Wells' medical records with Dr. Lutz dated January 2005 through December 2005.


Substantial Evidence Exists to Support ALJ's Decision

The ALJ found that Wells suffered from obesity and post-fusion back pain, which were "severe" impairments under the federal regulations. (Tr. 14). Despite these impairments, the ALJ determined that Wells retained the residual functional capacity to perform unskilled light work activities. (Tr. 17). It is the ALJ's finding with respect to Wells' residual functional capacity that is at issue here.

In determining Wells' residual functional capacity, the ALJ relied upon Dr. Lopez' residual functional assessment of Wells.

-16-

The ALJ found that Dr. Lopez' findings were valid and supported by Wells' medical treatment records.  The ALJ detailed and recounted Wells' post-surgical treatment, and noted that it consisted of conservative measures.  (Tr. 15-17).  The ALJ took notice that Dr. Lutz was considering enrolling Wells into a work-hardening and job conditioning program in February 2004.  (Tr. 15).  The ALJ placed importance on the fact that Dr. Lopez' findings were reviewed and affirmed by Dr. Cocoran.  Overall, the ALJ found that Dr. Lopez' conclusion regarding Wells' residual functional capacity was supported by the record as a whole.

Given that the ALJ discussed the relevant evidence for Wells' alleged impairments, resolved inconsistencies, and reached reasonable conclusions, substantial evidence supported that decision.  *Jens*, 347 F.3d at 212.

> The ALJ acted within her discretion in
> discrediting the February 2005 functional capacity exam

The ALJ gave no weight to the February 2005 functional capacity assessment made by the physical and occupational therapists, which found that Wells could not work.  Instead, the ALJ determined the medical evidence was more consistent with the functional capacity assessment made by Dr. Lopez and affirmed by Dr. Corcoran.  Wells dedicates a large portion of her brief arguing that the ALJ should have credited the February 2005 examination, as the therapists are experts.  Wells goes on to complain that the ALJ

is improperly "playing doctor" by discrediting the February 2005 examination. However, in the wake of conflicting medical evidence, as is the case here, the ALJ is given broad discretion to weigh and credit or discredit that evidence to resolve inconsistencies. 20 C.F.R. § 1527(d); *Peabody Coal Co. v. Director, Office of Workers' Comp. Programs, United States Dept. Of Labor*, 778 F.2d 358, 362 (7th Cir. 1985).

This Court cannot say that the ALJ was outside of her bounds to discredit the therapists' conclusion. The ALJ questioned the internal soundness of the therapists' assessment, which is not unreasonable. While the therapists found that Wells could not work, they also noted that Wells engaged in self-limiting behavior during the exam, displayed over-reaction behavior, and gave low verbal pain rating. (Tr. 15). In addition, the ALJ took issue with the fact that the therapists' evaluation was not endorsed by a physician. (Tr. 16). To the contrary, the ALJ pointed out that the therapists' opinion conflicted with that of Drs. Lopez and Cocoran. Finally, after much discussion, the ALJ determined that the medical records were more consistent with Dr. Lopez' assessment than the therapists'. It is also worthy to point out that the evaluation performed by Dr. Lopez and affirmed by Dr. Cocoran is considered evidence from an acceptable medical source, 20 C.F.R. § 1513(a), whereas the evaluation performed by the therapists is deemed evidence from "other sources." 20 C.F.R. § 1513(d)(1).

Based upon the record, this Court finds that it was within the
ALJ's discretion to discredit the therapists' functional capacity
evaluation.

> The ALJ acted within her
> <u>discretion in discrediting the Wells family's testimony</u>

At the hearing, Wells and her family testified that her
injuries precluded her from doing much of anything.  Wells claims
that the ALJ discrediting her and her family's testimony is
patently wrong and requires a remand.  Because the ALJ is best
positioned to judge a witness's truthfulness, this Court will
overturn an ALJ's credibility determination only if it is patently
wrong.  *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).
However, when a claimant produces medical evidence of an underlying
impairment, the ALJ may not ignore subjective complaints solely
because they are unsupported by objective evidence.  *Schmidt v.
Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005).  Instead, the ALJ
must make a credibility determination supported by record evidence
and be sufficiently specific to make clear to the claimant and to
any subsequent reviewer the weight given to the claimant's
statements and the reasons for that weight.  *Lopez v. Barnhart*, 336
F.3d 535, 539-40 (7th Cir. 2003).

At the hearing, Wells and her family members essentially
testified that Wells' injury had taken away her ability to much of
anything.  In the ALJ's fifth finding, she found that Wells'

"allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision."  (Tr. 19). Moreover, the ALJ discredited the family' testimony as well.  (Tr. 15).

The ALJ discredited the Wells family's testimony in large part because, the ALJ found that it was contrary to most of the medical evidence.  The ALJ found the medical evidence was most consistent with the determination of the state agency medical consultants' functional capacity exam.  (Tr. 15).  That exam concluded that Wells retained the residual functional capacity for light work that did not require more than occasional postural changes.  (Tr. 15).

The ALJ also discredited Wells' testimony due to her actions and demeanor during the February 2005 assessment made by physical and occupational therapists.  After examining Wells, the therapists noted that Wells engaged in self-limiting behavior, displayed over reaction behavior, and her test responses reflected exaggeration on her part.  (Tr. 15).  These findings, the ALJ noted, undermined Wells' credibility.  (Tr. 16).

The ALJ's credibility determination is supported by the record and specifically explained.  Therefore, this Court will not disturb the ALJ's finding.  *Lopez*, 336 F.3d at 539-40.


Untimely submission of medical records to Appeals Council

The ALJ found no records of treatment with Dr. Lutz after

-20-

March 30, 2004, even though Wells told the therapists in February
2005 that she was continuing to see Dr. Lutz.   The ALJ wondered
about the absence of treatment records with Dr. Lutz.  (Tr. 15-16).
By relying on *Boiles v. Barnhart*, 395 F.3d 421 (7th Cir. 2005),
Wells argues that the ALJ is not entitled to make any finding based
on the absence of medical records.  Thus, Wells claims that the ALJ
erred in wondering about the absence of treatment records of Dr.
Lutz.

In *Boiles*, the alj found that the lack of emergency room
visits was evidence that Boiles' seizures were not frequent enough
to be equal in severity to impairments in Listing 11.02.  However,
the court found that the alj's reliance on the lack of records was
misplaced because there was no evidence in the record to support
the conclusion that Boiles' seizures were not frequent enough to
meet Listing 11.02.  *Id.* at 425.  The court noted that the alj did
not point to anything in the record that contradicted a physician's
testimony that hospitalization was futile for someone suffering
from pseudoseizures, such as Boiles.  *Id.*  Ultimately, the court
held that the alj in *Boiles* was not allowed to rely on the lack of
medical records because their absence was irrelevant to the
claimant's condition.   Clearly, *Boiles* does not stand for the
general principle that an alj cannot rely on the absence of medical
records.  Instead, *Boiles* only held that when the lack of medical
records is immaterial to the claimant's condition, those medical

records can not be used as evidence regarding the claimant's
condition.  Understanding this limited holding clearly shows that
Wells' reading of *Boiles* is overly broad and for naught.

Wells also takes issue with the ALJ's finding because she
claims that she did continue to see Dr. Lutz.  In fact, Wells
submitted medical records to the appeals council from Dr. Lutz,
dated January through December 2005. (Tr. 3).  However, the ALJ
cannot be faulted for not considering Dr. Lutz's records from
January through December 2005 as Wells failed to submit them.  See
e.g. *Diaz v. Chater*, 55 F.3d 300, 305 n.1 (7th Cir. 1995)(noting
that evidence submitted for the first time to the Appeals Council
cannot be considered in determining the correctness of the ALJ's
decision).

Wells asks that this case be remanded without a ruling on the
evidence because the additional evidence submitted to the Appeals
Council is new and material.  (Reply, pp. 3-4).  42 U.S.C. section
405(g) authorizes this Court to remand the case for consideration
of newly discovered material evidence, if there was good cause for
failure to incorporate the additional evidence into the record at
the prior hearing.  See *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th
Cir. 1997).  The problem with using section 405(g) here is that Dr.
Lutz's records are not newly discovered, nor does Wells claim them
to be.  In addition, Wells does not argue that there is any good
cause for their exclusion into the administrative record before the

-22-

ALJ.  Those records were in existence before the administrative hearing.  On July 21, 2005, Wells' attorney represented to the Social Security Administration that the evidence in the file was up to date and the case was ready to be scheduled for a hearing.  (Tr. 32).  Further, at the hearing, Plaintiff did not object to the record exhibits when asked, or inform the ALJ of any outstanding records or evidence.  (Tr. 276).  Thus, there was no good cause for their omission before the ALJ and, therefore, considering them here would be inappropriate.

Nevertheless, even if there was good cause for the records' omission, they would not be considered material.  Materiality, in this context, means there is a "'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered . . .." *Perkins*, 107 F.3d 1290.  Notably, the Appeals Council considered the additional records from Dr. Lutz and determined that those records were not material.  (Tr. 4-6).  As the materials were considered by the Appeals Council, its decision is discretionary and will not be disturbed by this Court, as the Appeals Council acted within its discretion.  *Id.* at 1294.

CONCLUSION

For the reasons set forth above, the Commissioner's final decision denying social security benefits is **AFFIRMED** pursuant to

42 U.S.C. section 405(g).  Accordingly, the Clerk is **ORDERED** to close this case.


DATED:  **November 9, 2007**          **/s/RUDY LOZANO, Judge**
                                       **United States District Court**